Approved: _____
Brett M. Kalikow
Assistant United States Attorney

Before: THE HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York

19 MAG 8588

------------------------------------ X

UNITED STATES OF AMERICA            : **SEALED COMPLAINT**
                                    :
                                    : Violations of 18 U.S.C.
           - v. -                   : §§ 371 and 2, 7 U.S.C.
                                    : §2024(b)
                                    :
MOHAMMED ALTAF HOSSAIN,             : COUNTY OF OFFENSE:
                                    : NEW YORK
           Defendant.               :
                                    :
------------------------------------ X

SOUTHERN DISTRICT OF NEW YORK, ss.:

RICHARD P. SMYTHE, JR., being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") for the United States Department of Justice ("DOJ"), and charges as follows:

**COUNT ONE**
(Conspiracy Against the United States)

1. From at least on or about March 14, 2018 up to and including at least on or about August 13, 2018, in the Southern District of New York and elsewhere, MOHAMMED ALTAF HOSSAIN, the defendant, and others known and unknown, knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate Title 7, United States Code, Section 2024.

2. It was a part and object of the conspiracy that MOHAMMED ALTAF HOSSAIN, the defendant, and others known and unknown, did knowingly use, transfer, acquire, alter, and possess supplemental nutrition assistance program ("SNAP") benefits of a value of $5,000 and more, in a manner contrary to Chapter 51 of Title 7 of the United States Code and the

regulations issued thereunder, in violation of Title 7, United States Code, Section 2024.

Overt Act

3. In furtherance of the conspiracy and to effect the illegal object thereof, MOHAMMED ALTAF HOSSAIN, the defendant, committed the following overt act, among others, in the Southern District of New York and elsewhere:

a. On or about May 14, 2018, HOSSAIN purchased goods using SNAP benefits balances belonging to people other than HOSSAIN. HOSSAIN made the purchase from a store in the Bronx, New York, the owner of which agreed with HOSSAIN to circumvent the statutes and regulations governing the SNAP program.

(Title 18, United States Code, Section 371.)

**COUNT TWO**
(SNAP Program Violation)

4. On or about May 14, 2018, in the Southern District of New York and elsewhere, MOHAMMED ALTAF HOSSAIN, the defendant, did knowingly use, transfer, acquire, alter, and possess supplemental nutrition assistance program benefits of a value of $100 and more but less than $5,000, in a manner contrary to Chapter 51 of Title 7 of the United States Code and the regulations issued thereunder, to wit, HOSSAIN purchased goods using SNAP benefits balances belonging to people other than HOSSAIN.

(Title 7, United States Code, Section 2024(b), and Title 18, United States Code, Section 2.)

The bases for my knowledge of the foregoing charges are, in part, as follows:

5. I have been a special agent with the FBI for 15 years. I have been personally involved in the investigation of this matter. This affidavit is based on my conversations with law enforcement agents and others, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the offenses cited above, it does not include all the facts that I have learned during the course of the investigation. Where the contents of conversations of others are reported herein, they

are reported in substance and in part, except where otherwise indicated.

## The Supplemental Nutrition Assistance Program

6. Based on my training and experience, I have learned that:

a. Congress established the Federal Food Stamp Program in 1977 for the purpose of alleviating hunger and malnutrition. In 2008, the program was renamed the Supplemental Nutrition Assistance Program ("SNAP"). SNAP uses tax dollars to subsidize low-income households, helping low-income individuals and families to maintain more nutritious diets by increasing the food purchasing power of eligible households.

b. The USDA Food and Nutrition Service ("FNS") administers SNAP through retail food stores that have been approved for participation in SNAP to sell food in exchange for SNAP benefits. Under Chapter 51, Title 7 of the United States Code, and regulations issued thereunder, a business that accepts SNAP benefits must do so only in connection with retail sales of certain eligible food products, and must be authorized by FNS as a retail food store. According to USDA regulations, items such as cigarettes, among other items, are ineligible for purchase with SNAP benefits ("Ineligible Items"). Furthermore, a business that accepts SNAP benefits only may accept SNAP coupons from eligible households or those households' authorized representatives.

c. To participate in SNAP, the owner or operator of a retail food store must first apply for authorization and complete an application. In addition, before a store can redeem SNAP benefits, the store's owner or a designated representative must watch an instructional orientation DVD, which is mailed to the retail food store with its SNAP license. The pertinent rules and regulations relating to SNAP are explained in the instructional DVD. In the application itself, SNAP rules and regulations are listed in bullet-point form on the last page. A retail applicant is required to certify his or her understanding of the listed rules and regulations, including the rules prohibiting the exchange of SNAP benefits for Ineligible Items and rules prohibiting exchange of SNAP benefits with anyone besides eligible households or those households' authorized representatives.

d. A SNAP benefit recipient is issued a card similar to a debit card, called an electronic benefits transfer

3

card ("EBT Card"[1]), which has the benefit recipient's name printed on it. A SNAP benefit recipient may not transfer his or her EBT Card to anyone, and only a benefit recipient may use his or her own EBT Card. To make an eligible item purchase, the recipient's EBT Card is swiped through and EBT terminal provided to the retailer pursuant to SNAP. After the recipient enters a Personal Identification Number ("PIN"), the EBT terminal verifies the PIN, determines whether the recipient's account balance is sufficient to cover the proposed purchase, and informs the retailer whether the transaction should be authorized or denied. If the transaction is authorized, the amount of the purchase is deducted electronically from the SNAP benefits reserved for the recipient. The retailer subsequently is paid the amount of the EBT purchase through an electronic transfer of funds from the United States government to the retailer's designated bank account.

### HOSSAIN's EBT Scheme

7.  Based on my conversations with a confidential source ("CS-1"[2]) and FNS records, I have learned, in substance and in part, the following:

    a.  CS-1 owns three grocery stores in the Bronx, New York, and Queens, New York (collectively, the "CS-1 Stores").

---

[1] For the purposes of this Complaint, all references to EBT cards will refer to those used in connection with SNAP benefits.
[2] In 2015, CS-1 was convicted of various federal crimes in this District. CS-1 pleaded guilty pursuant to a cooperation agreement with the United States Attorney's Office for the Southern District of New York (the "Office"), and the Office submitted a letter pursuant to Section 5K1.1 of the United States Sentencing Guidelines in connection with CS-1's sentencing. The Office has also provided CS-1 with a letter informing immigration authorities of CS-1's substantial assistance to law enforcement in connection with the cooperation agreement. The crimes to which CS-1 pleaded guilty, and crimes about which CS-1 provided the substantial assistance, are unrelated to the crimes alleged in this Complaint.
CS-1 has not been paid in exchange for providing information to law enforcement agents concerning this case (nor, as far as I am aware, any other case). CS-1 has provided reliable information in the past, and the information CS-1 has provided in this case has been corroborated in part by, among other things, audio and video recordings and transaction records.

4

b. CS-1's stores are authorized by the FNS to accept SNAP program benefits as payment for goods, and were so authorized during calendar year 2018.

8. Based on my review of summary translations of recordings of conversations between CS-1 and MOHAMMED ALTAF HOSSAIN, the defendant,[3] as well as my conversations with CS-1,[4] I have learned, in substance and in part, the following:

a. On or about March 14, 2018, HOSSAIN visited one of CS-1's stores.[5] In substance and in part, HOSSAIN told CS-1 that HOSSAIN is part of the ownership group of a grocery store in Philadelphia, Pennsylvania (the "Hossain Store") which lost its ability to accept EBT cards because of fraud. HOSSAIN showed CS-1 a stack of EBT cards. In addition to an EBT card in HOSSAIN's own name, the stack contained EBT cards with the names of other individuals. HOSSAIN proposed that CS-1 charge at the CS-1 Stores EBT Cards belonging to various individuals, the PIN codes for which HOSSAIN would provide, in exchange for goods. HOSSAIN told CS-1 that HOSSAIN he would bring approximately $7,000 to $8,000 worth of cards each month to CS-1.

b. Between on or about April 11, 2018 and on or about August 13, 2018, HOSSAIN made at least approximately 12 visits to the CS-1 Stores at times when CS-1 was present in the stores. During each of these visits, HOSSAIN spoke with CS-1 and purchased goods using EBT cards belonging to other individuals as payment. CS-1 recorded each of CS-1's conversations with HOSSAIN beginning on or about March 14, 2018.

c. On or about April 16, 2018, CS-1 informed law enforcement of the scheme. By that time, HOSSAIN provided CS-1 with EBT cards belonging to other individuals on approximately two occasions, during which CS-1 agreed to and did charge the EBT cards belonging to individuals other than HOSSAIN for goods that were provided to HOSSAIN. After April 16, 2018,

---

[3] CS-1 and HOSSAIN spoke to each other in Bengali. Summary translations of the recordings were prepared by a certified FBI translator.
[4] My conversations with CS-1 were conducted in English.
[5] HOSSAIN showed CS-1 HOSSAIN's Pennsylvania Driver's License, and CS-1 made a photocopy, which CS-1 later provided to law enforcement. Based on my review of law enforcement records, I know that the driver's license HOSSAIN showed CS-1 matches the driver's license with the same number and name that is in Pennsylvania's motor vehicles records.

CS-1 continued to participate in the scheme at the direction of law enforcement.

        d. Over the course of HOSSAIN's visits to the CS-1 Stores, HOSSAIN and CS-1 engaged in several conversations, including about the EBT card scheme. During these conversations, HOSSAIN told CS-1, in substance and in part, the following:

        i. That HOSSAIN also goes to other stores because HOSSAIN does not want to make trouble for CS-1;

        ii. That HOSSAIN resells the products he buys using EBT cards belonging to others;

        iii. That HOSSAIN obtains the EBT cards from the customers of the Hossain Store;

        iv. That HOSSAIN agrees with CS-1's statement to HOSSAIN that CS-1 and HOSSAIN are using the EBT cards of others illegally.

        9. Based on my review of receipts provided by CS-1 and FNS records of EBT transactions, I have learned, in substance and in part, the following:

        a. From April 11, 2018 to August 13, 2018, HOSSAIN made approximately 59 purchases totaling approximately $25,000 at the CS-1 Stores using EBT cards belonging to approximately 12 individuals other than HOSSAIN.

        b. For example, on or about May 14, 2018, HOSSAIN purchased approximately $2,600 worth of goods from CS-1's store in the Bronx, New York using EBT cards belonging to 9 individuals other than HOSSAIN.

        10. Based on my review of FNS records, I have learned, in substance and in part, the following:

        a. On or about January 12, 2017, FNS administratively charged the Hossain Store with trafficking. FNS sent a letter to the Hossain Store explaining, in substance and in part, that the store "has violated the [SNAP] regulations" because "[a]nalysis of the records reveal [EBT] transactions that establish clear and repetitive patterns of unusual, irregular, and inexplicable activity for your type of [store]."

6

    b. On or about April 6, 2017, FNS determined that the Hossain Store had committed the charged violations, and permanently disqualified the Hossain Store from participating in SNAP.

    WHEREFORE, the deponent respectfully requests that a warrant be issued for the arrest of MOHAMMED ALTAF HOSSAIN, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

              _____
               RICHARD P. SMYTHE, JR.
               Special Agent
               FBI

Sworn to before me this
12th day of September 2019

_____
THE HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York

7